UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:21-CR-22 SEP |
| ) | |
| ANTONIO HUBBARD, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant Antonio Hubbard, through Assistant Federal Defender Kevin Gau, respectfully requests this Honorable Court sentence him to 120 months' imprisonment, which is warranted in consideration of the 18 U.S.C. § 3553(a) sentencing factors. Mr. Hubbard's request accords with the parties' plea agreement, which permits the parties to argue for a sentence within a 120- to 168-month sentencing range (PSR ¶8). In further support of a 120-month sentence, Mr. Hubbard states:

### *Nature and circumstances of Mr. Hubbard's conduct*

Reference is made to PSR ¶14, detailing the facts supporting Count 1 of the indictment. J.L. died of acute fentanyl, hydrocodone, and ethanol intoxication. Mr. Hubbard in no way wishes to minimize the intrinsic value J.L.'s life had, and he acknowledges and is saddened by the loss and pain J.L's family and friends have experienced with J.L.'s death. Mr. Hubbard understands, too, that the fentanyl he sold contributed to J.L.'s death. But undersigned counsel notes two unusual circumstances

that should not be overlooked in measuring how J.L.'s death should impact Mr. Hubbard's sentencing. First, there were additional contributing causes—hydrocodone and ethanol intoxication—that Mr. Hubbard was not responsible for, as he had only sold the fentanyl that came into J.L.'s possession.

Second, it was J.L.'s acquaintance, R.F., who was instrumental in ensuring J.L. was sold fentanyl in the first place, as it was R.F. who brokered the deal (*See* PCR ¶ 22). J.L., who was paraplegic and confined to a wheelchair, was taken by R.F. to Mr. Hubbard's residence in St. Louis. R.F. conducted the buyer-end of the fentanyl transaction and supplied the purchased capsule to J.L. R.F. was undoubtedly well-acquainted with J.L.'s poor health circumstances (given the familiarity between them evidenced by R.F.'s assistance in transporting J.L. to the sale), but nevertheless undertook to procure fentanyl for J.L. Despite R.F.'s role in J.L.'s drug use and death, undersigned counsel believes R.F. has not faced, nor will face, 120 or more months' imprisonment for his role. Consequently, punishing Mr. Hubbard to a term greater than 120 months will invite too dissimilar a punishment to the anticipated lighter sentence (if any) R.F. may receive for J.L.'s tragic death, since R.F. is similarly culpable.

In addition to these unusual circumstances, the undersigned notes Mr. Hubbard's 120-month request contemplates the Court making an *upward* departure from the 70- to 87-month range calculated at PSR ¶ 78; his request accords with an upward departure at USSG § 5K2.1 because of the death associated with the Count 1 conduct (see PSR ¶ 98). Mr. Hubbard is not asking the court to ignore J.L.'s death, but to give due consideration to

the context of that death and the culpability shared by R.F. and attendant tragic circumstances concerning J.L.'s health and death.

As for the remaining counts:  Given how much fentanyl Mr. Hubbard was involved in selling or attempting to sell—as he has admitted—it is a curious, positive fact that no firearms were seized in the search of his Olive Street, St. Louis residence despite there being several thousand dollars in proceeds, drugs, and the usual measuring and distributing kit of the drug trade (PCR ¶ 18).  Nor did investigators working any of the controlled-buy operations uncover any connection between Mr. Hubbard and firearms (PCR ¶ 15).  Mr. Hubbard has been a drug dealer, but not an armed one.  Such unarmed status militates for leniency, for obvious reasons.

It should also be noted that Mr. Hubbard accepted responsibility very soon after arrest.  During a long police interview on the day of his arrest, he eventually admitted his involvement in dealing fentanyl and heroin, describing how he would prepare it for sale, the few sales he had made to R.F., and his recollection of R.F. having brought J.L. to him in November 2018 (PSR ¶¶ 20 – 22).  Together, these various factors also support the 120-month request.

### History and character of Mr. Hubbard

Until sometime during his 14th year, Mr. Hubbard's childhood was marked both by his mother's frequent absence from the home, where she raised him and his six siblings as a single parent, and that home's location in the Jeff-VanderLou neighborhood in St. Louis City, where Mr. Hubbard witnesses many instances of gun violence and drug trafficking. Speaking to her frequent absences, Mr. Hubbard has come to realize that as his mother

3

had given birth to him when she herself was only 16, and his siblings' fathers all differ from one another, her sense of parental responsibility was itself largely absent at first. As he grew up under her care, he recalled she'd go out frequently to bars and nightclubs to socialize. These frequent absences took a toll on his ability to care for his siblings and his sense of self-worth, which led him to find unfortunate companionship as a young teenager with individuals already connected with street crime. These streetwise relationships led him to the only two instances of serious criminal conduct—heroin possession—with each instance occurring at age 17 (PSR ¶¶43, 44). We may speculate whether Mr. Hubbard's introduction to street-crime and illegal drug sales would have occurred had his mother been reliably present. Sometime during that 14th year, Mr. Hubbard relocated to live with his father, who attempted to exhibit some control, but Mr. Hubbard's maternal absence explains his drop out from high school and his early introduction to illegal narcotics. It supports a sentence at the lower end of the contemplated sentencing range.

Despite his undirected childhood, Mr. Hubbard persevered, after a fashion, for some years. His criminal history score is now zero (PSR ¶ 46), reflecting that his teenage possession cases were well behind him before he slipped back into the drug trade in the fall of 2018 some 22 years later. Although never completing high school or obtaining a GED (a goal he now has for himself once inside the Bureau of Prisons), Mr. Hubbard was able to maintain gainful employment in intensive work environs found in the food service and janitorial industries. Despite his slip into the drug trade, he was able to maintain two jobs six months before his arrest, working at Schnucks as a store associate and a floor tech at St. Mary's hospital (PSR ¶¶ 69, 70). Together these jobs kept him working

4

approximately 60 hours per week for six months, underscoring an industrious nature which can be directed to gainful use. A sentence greater than 120 months risks ignoring such worthy industriousness.

WHEREFORE, Antonio Hubbard respectfully requests that this Honorable Court sentence him to 120 months' imprisonment.

Respectfully submitted,

/s/ *Kevin B. Gau*
KEVIN B. GAU, #51595MO
Assistant Federal Public Defender
1010 Market Street, Suite 200
St. Louis, Missouri 63101
Telephone: (314) 241-1255
Fax: (314) 421-3177
E-mail: Kevin_Gau @fd.org
ATTORNEY FOR THE DEFENDANT

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Tiffany Becker, Assistant United States Attorney.

/s/*Kevin B. Gau*
KEVIN B. GAU
Assistant Federal Public Defender